**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

**Anna Elena Torres**,

Plaintiff,

v.

**The University of Chicago,**
**Mark Payne, and Na'ama Rokem;**

Defendants.

---

## COMPLAINT

Anna Elena Torres ("Torres" or "Plaintiff"), by and through undersigned counsel, bring claims of breach of contract as well as violation of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Illinois Human Rights Act against the against the defendants, the University of Chicago ("the University"), Mark Payne ("Payne"), and Na'ama Rokem ("Rokem") (collectively, "Defendants"), and in support of such claims, states as follows:

## NATURE OF THE CASE

1. From July 1, 2018 until June 30, 2026, Torres was employed as an Assistant Professor in the Department of Comparative Literature ("the Department" or "Comparative Literature") at the University of Chicago.

2. At the time of their last major performance assessment during the 2022-23 academic year, the University provided Torres positive reviews of their performance, specific quantitative guidelines for the remainder of their probationary period, and a tenure application date of July 1, 2025.

3. As July 1, 2025 approached, it became clear that Torres was on track to meet the quantitative and qualitative standards for promotion and tenure.

4. Since Torres's promotion and tenure is not a result the institutionally-powerful Chair of Comparative Literature desired, she provided the rest of the tenured members of the department with a partial dossier of Torres's work, much of which the voting members did not even review, held a vote on Zoom without following due process and without administrative oversight, and informed Torres that they could not proceed with the tenure review process for which Torres had been preparing their entire career.

5. In so doing, the Department circumvented contractual promises establishing the timeline and procedural steps of the tenure process and departed from longstanding policy and practice. In explaining the Department's decision to the Dean of the Arts & Humanities Division, the Chair disparaged Torres's public speech in support of scholars in Gaza as well as her anarchist, working class, and Jewish anti-Zionist scholarship.

6. The Dean and the Provost of the University accepted the Department's decision without question and without conducting any substantive or procedural review of their own.

7. This unilateral decision to preclude Torres from applying for tenure constitutes a breach of the University's employment contract with Torres and discrimination based on Torres's race, their sex, and their counter-stereotypical scholarship and speech as a scholar of working class, Jewish anti-Zionist, antifascist, and anarchist Yiddish literature and history.

## PARTIES

8. Plaintiff Anna Elena Torres is a former faculty member of the University of Chicago and a resident of Cambridge, Massachusetts.

9. The University of Chicago is a private, not-for-profit organization properly recognized and sanctioned by the laws of the State of Illinois.

## JURISDICTION AND VENUE

10. Torres filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") on January 29, 2026.

11. Torres opted out of the IDHR investigation process. On April 9, 2026, the IDHR issued them an official notice of administrative closure and right to commence a civil action.

12. On June 9, 2026, the EEOC adopted the findings of the IDHR and issued Torres a notice of their right to sue.

13. This Court's jurisdiction is invoked pursuant to its authority over civil actions arising under the laws of the United States and pursuant to its authority over claims that form part of the same case or controversy as those arising under federal law. 28 U.S.C. §§ 1331, 1367.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as the Northern District is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"

## FACTS COMMON TO ALL CLAIMS

***a. The contractual provisions at issue***

15. In July of 2017, the University offered Torres a position as an Assistant Professor in the Department of Comparative Literature in the University's Arts & Humanities Division, to begin on July 1, 2018. Exhibit A ("the Appointment Letter"). Torres accepted and began work. *Id.*

16. The Appointment Letter identified several policies that would govern the employment relationship. Ex. A at p. 3 ("Terms and responsibilities of employment include all the policies and procedures outlined in the University Statutes and Faculty Handbook accessible online at http://facultyhandbook.uchicago.edu/").

17. Among the policies referenced in the Appointment Letter is the University's "Shils report," which sets forth tenure procedures and criteria. Ex. A at p. 1. That document, which remains in effect and was not amended at any point in Torres's employment, is attached hereto as Exhibit C.

18. The University's Articles of Incorporation are also incorporated into Torres's Appointment Letter, and are attached hereto as Exhibit D.

19. At the University, Assistant Professors are appointed for a three or four-year term, and if that term is renewed, they are reviewed for promotion to Associate Professor and "indefinite tenure." Ex. D at §§ 11.1.3, 11.1.4.

20. Torres's Appointment Letter sets forth specific quantitative guidelines for scholarship in the Department. Ex. A at p. 1.

21. The Statutes of the University of Chicago ("the University Statutes") require that the Department's tenure review and recommendation to the Dean do not begin until *after* the candidate "has completed all but the last year of service under a second full-time appointment and is in the last year (sixth or seventh year as the case may be) of such appointment." Ex. D at § 11.1.3.

22. The last year of Torres's appointment was the 2025-26 academic year. Their renewal letter consequently specified July 1, 2025 as the tenure application deadline, consistent with the timeline set forth in the University Statutes. Ex. B p. 2; Ex. D at § 11.1.3.

23. The review of the candidate's scholarship entails a review of "the entirety of the candidate's work." Ex. A p. 1.

24. The University requires review of tenure applicants' scholarship by experts outside of the University of Chicago. Ex. G at §§ 2.1.2, 2.6.2. This requirement is especially important when there is a dearth of experts in the candidate's field at the University. Its purpose "is to gauge the assessment of the field concerning the 'originality, rigor, and fundamental significance' of the candidate's work and the extent to which the top scholars in the candidate's discipline judge that the candidate 'is or will become a leading figure' in the field." Ex. G at p. 24.

25. The departmental decision is described as a recommendation, not a unilateral decision. Ex. D at § 11.1.3. According to the Shils report, tenure reviews "should originate within departments and schools, pass to the dean of the division or school, and thence to the Provost and President for approval or rejection or reference back for further consideration." Ex. C at p. 7.

26. At the department level, the review culminates in a letter "evaluat[ing] the candidate's research, teaching, and contributions to the intellectual community both within the University and at large." Ex. G at p. 24. Further, "the dean's analysis is critical." *Id.* If the department does not provide the required analysis, "the provost must rely on the dean to provide an analysis that does not presuppose a specialist's knowledge of the field and an explanation of why the senior faculty deem the candidate's research to be fundamental and significant." *Id.*

27. The Provost's office is required to conduct a careful, substantive review of each case. Ex. G at p. 12 ("We read each case with care, and we evaluate the case's argument and evidence in support

of the action it recommends. This degree of vetting takes time. Normally, a review can be completed within about two weeks.").

28. The Guidelines on Academic Appointments, Promotions, and Hiring (which are also part of the University's Handbook for Faculty, incorporated into Torres's appointment letter), repeatedly refer to the roles of chair of the department and chair of the tenure committee as two separate roles and imply they should be held by separate people. They contemplate, for example, that the tenure committee, chair and dean each produces a letter or report. See Ex. G at pp. 16, 24, 29. The separation is important because of the risk that the department chair – who influences the salaries and career progress of all faculty – would have a disproportionate influence on the assessment of the committee.

29. The University also incorporates into its faculty contracts strong protections for freedom of expression. The Articles of Incorporation provide, "The basic policies of the University of Chicago include complete freedom of research and the unrestricted dissemination of information." Ex. D at § 18.1.

30. The University adopted its Report of the Committee on Freedom of Expression as official policy and makes the report available publicly on its website, boasting that "[t]he resulting 'Chicago Principles' have since been adopted by universities and colleges across the country."[1] It declares that "without a vibrant commitment to free and open inquiry, a university ceases to be a university. The University of Chicago's long-standing commitment to this principle lies at the very core of our University's greatness." Ex. E at p. 4. The report therefore "guarantees all members of the

[1] https://freeexpression.uchicago.edu/

University community the broadest possible latitude to speak, write, listen, challenge, and learn," with very narrow exceptions which are not applicable to Torres. *Id.* at p. 3.

31. The University also recognizes, through its publicly-available Protests and Demonstrations Policy, that in order to fulfill the University's primary function of discovery and dissemination of knowledge by means of research and teaching, "a free interchange of ideas is necessary not only within the University but also with the larger society." Ex. F. "The right of freedom of expression at the University" therefore "includes peaceful protests and orderly demonstrations." *Id.*

### *b. The Renewal Contract*

32. During the 2022-23 academic year, the University conducted a detailed review to assess whether Torres's progress towards tenure merited renewal of their contract for a second term.

33. During that process, current chair Professor Na'ama Rokem and former chair Professor Mark Payne wrote in high praise of Torres's scholarship. Rokem wrote, in a letter she coauthored with Professor Loren Kruger, "Torres's record of research, teaching, and service clearly goes above and beyond the expectations for a first-term Assistant Professor and merits the prompt renewal of her contract as Assistant Professor. Her thoughtful scholarship, her dedicated teaching, and her energetic commitment to public education bode well for her upcoming tenure review and promotion to Associate Professor in due course."

34. Payne concurred, writing on October 10, 2022, "As chair, I agree wholeheartedly with the view of my colleagues that Anna's dossier presents a clear and obvious case for renewal. Indeed, as Faith Hillis [a senior professor of Russian History at U. Chicago] notes, her productivity is <u>already commensurate with many tenure dossiers</u>." (emphasis added).

35. In May of 2023, then-Dean Anne Robertson presented Torres with a letter (dated December 15, 2022) ("the Renewal Letter") renewing their appointment, reiterating several provisions of the

parties' contract, and summarizing the Division's substantive review of their performance. Ex. B. Torres accepted the terms of the Renewal Letter. *Id.*

36. The Renewal Letter praised Torres's "impressive pedagogical skills," their "exemplary engagement with the University" through their service work, and their "generally favorable" progress in the area of scholarship. It provided specific guidance about how to ensure a "strong tenure case" in research.

37. The Renewal Letter also made a number of promises to Torres in preparation for the tenure review.

38. First, the Renewal Letter obliged the department to provide research feedback and mentorship. *See e.g.* Ex. B at p. 2 ("Your faculty mentor will continue to meet with you to discuss new drafts and new material, to help guide you as you develop articles and your second major project, and to strategize about the most effective placement of your research.").

39. Second, the Renewal Letter committed to allowing Torres time for research. It promised, "Know that your chair is committed to helping you guard your research time more effectively during your second term, and will work with you to make this possible." Ex. B at p. 3.

40. Third, the Renewal Letter set July 1, 2025 as the tenure application date. Ex. B at p. 2.

***c. Defendants express ideological opposition to Torres's scholarship and a warning.***

41. Following receipt of the renewal letter, Torres met with Payne and incoming chair Rokem in the Spring of 2023 to express concern about two comments in their renewal letter. Torres first said that the criticism of the central argument in their book as "diffuse" reflects an ideological difference between Marxist and anarchist scholars. "Why is there a political dog whistle in the middle of this letter?" they asked. Torres also expressed concern that the renewal letter warned them away from doing activist work, such as serving as a liaison with Scholars at Risk.

42. During the same meeting, Torres also expressed concern about a provision near the end of the Renewal Letter which discouraged them from their artistic collaborations. During the meeting Rokem retorted, in reference to Torres's art collaboration at the prestigious Venice Biennale, "I don't pay you to make art."

43. The artwork Rokem was referencing was in fact closely related to Torres's scholarship and was inspired by Jewish anarchist literary critic Baruch Rivkin, who conceptualized Yiddish literature as a diasporic 'pseudo-territory' rather than aspiring to a Jewish nation-state. This collaboration drew from Torres's academic research in Yiddish sound, text, and visual archives. Torres's artwork inspired by Rivkin was later acquired by the permanent collection of the POLIN Museum in Warsaw and was installed in a new exhibition on Jewish languages and visual art. This exhibition was the subject of an international academic conference in June 2026.

44. Rokem's opposition to the prestigious Venice Biennale and Polin Museum project resulted not from her desire to mentor Torres in their scholarship efforts but from ideological opposition to Rivkin's work and her hostility towards Torres's engagement with that work as a Jewish, anarcho-syndicalist, and anti-Zionist scholar.

45. Rokem emphatically advised Torres that in order to be granted tenure, "The next few years must become the most conservative of your career." Rokem thus explicitly indicated to Torres that they should adjust the political perspective of their work in order to succeed while under her chairmanship of the department.

46. After this meeting, Rokem and Payne increasingly planned work events on Friday evenings when they knew Torres observed Shabbat, the Jewish day of rest (which begins Friday evening), and excluded Torres from invitations to important departmental gatherings which they continued to hold on Shabbat, even following Torres's written request for religious inclusivity.

47. Torres later told Rokem that they found her comment "I don't pay you to make art" disrespectful, and that her instruction to cease refugee support activism and become "conservative" was inappropriate. Rokem brought up this conversation several times over the following years, asking Torres if they still felt that way.

***d. Rokem attempts to prevent Torres from meeting the tenure standard.***

48. In the two years that followed renewal of Torres's appointment, the University breached all three of the promises in the Renewal Letter.

49. Following Rokem's appointment as Chair in Fall of 2023, the Department assigned Torres a herculean amount of service responsibility for an Assistant Professor. Most significantly, the Department charged Torres with overseeing the entire undergraduate program. In the two years that followed, Torres recruited a large number of students, redesigned the capstone course, supervised theses, organized events and panels, mentored students to successfully enter doctoral and MFA programs, and grew the cohort of thesis-writing seniors exponentially. This assignment significantly expanded the Department's stature on campus and improved academic life for students but detracted from Torres's research time. Numerous emails and letters from students attest to the positive impact Torres had on their education.

50. Rokem refused to provide course releases to account for this unusually heavy service responsibility, despite a specific recommendation from an external review of the Department to "[g]ive a course release to the [the Director of Undergraduate Studies (DUS)]" and "[c]reate an undergraduate Curriculum Committee . . . to avoid unfairly burdening the DUS."

51. Rokem pointedly and repeatedly declined to implement the External Review Committee's recommendations. For example, on November 20, 2024 when Torres renewed their request for a course release, citing the additional reason that they were recovering from surgery and pointing out

that Rokem had two course releases as chair, Rokem responded, "I have power and you don't." Rokem then asked for a *quid pro quo* in order to even consider a course release: "What can you do for me?"

52. For the academic year 2025-26, the Department has assigned at least three people to share the DUS work that Torres was doing alone. Those faculty have accomplished significantly less in terms of undergraduate mentorship, recruitment, events, and scholarly feedback than Torres did in that role.

53. Assigned mentor Rokem also declined to provide mentorship at critical junctures despite repeated written requests. For example, she ignored requests for feedback, in particular with respect to the second monograph proposal. In the winter of the 2024-25 year, she further declined to attend two campus talks Torres gave, which presented new work before submission of journal articles and the second monograph. In fact, nobody from Torres's tenure committee attended either talk. Torres nonetheless provided the tenure committee with recordings of both talks via the Google Drive folder, but did not receive any feedback in response to that format either.

***e. Fearing that Torres was nearing attainment of the quantitative tenure standard, Rokem and Payne scramble to preclude a tenure review.***

54. Despite these efforts at sabotaging Torres's tenure progress, as the tenure application deadline approached, Torres was on track to meeting or exceeding the department's stated expectations in scholarship.

55. By the spring of 2025, Torres's first book had garnered several positive reviews. Torres was expecting to hear back by May 1 about whether their articles would be accepted in several top journals, and the prestigious Rutgers University Press had signaled strong interest in offering a contract for their second monograph. Rutgers was one of several academic presses interested in

publishing Torres's second monograph, and Torres decided to submit a proposal and chapters of the book manuscript to Rutgers for peer review. During the 2024-25 academic year, Torres kept Rokem apprised of this progress, including the fact that they expected to hear back from the top journals and Rutgers before the tenure deadline of July 1.

56. Consistent with the schedule set forth in Division of Humanities policy, during the winter quarter of 2025, Rokem instructed Torres to assemble a preliminary dossier. Rokem asked Torres to upload the files on an unsecured Google Drive and to exclude certain scholarly material and work in progress from their curriculum vita and from the Google Drive.

57. In addition to the materials Torres was asked to exclude, this preliminary tenure file did not include letters from specialists in Torres's field from inside or outside the University, nor letters from undergraduate and graduate students whom Torres had extensively trained and mentored.

58. On February 3, 2025, Torres submitted the list of suggested outside experts in Torres's field ("recommenders") to Rokem as instructed. Rokem told Torres not to provide the names of internal recommenders outside the department whose expertise overlaps with Torres's, saying that would be done later. Several senior scholars of other departments Torres affiliated with told Torres that they expected to write letters attesting to Torres's scholarly, pedagogical, and administrative contributions to the broader university beyond Comparative Literature. Shortly thereafter, Rokem and administrator Gaby Choi informed Torres that the Department had advanced their case, external recommendation letters had been requested, and hard copies of their book had been ordered and mailed out to some external recommenders.

59. The Department scheduled a Zoom meeting on April 4 with Torres with the stated purpose of providing feedback on Torres's preliminary materials, including the drafted CV and research and pedagogy statements. Rokem described the nature of the meeting as follows: "Our plan is to discuss

what best advice we provide about what exactly you should upload, and how to present the second book project, given the feedback you got in your renewal letter."

60. Then, Rokem canceled the April 4 meeting and transformed the preliminary review into a premature formal tenure review without informing Torres of the change. The departmental committee did not provide the promised feedback on the tenure materials, despite such feedback being customary.

61. Rokem served as both chair of the department and chair of the tenure committee.

62. During the rescheduled meeting on April 15, 2025, attended by Torres, Rokem and Payne in Rokem's office, Rokem informed Torres that the Department would not support their (not yet submitted) application for tenure, and that Torres could not proceed with the July 1 submission.

63. Payne justified the decision by saying that Torres was insufficiently productive in terms of peer-reviewed articles. When Torres pointed out that there were several articles under peer review that they expected to hear back about before July 1, Payne responded that it was "already too late," and additional publications "would make no difference." Rokem added that Torres's first monograph was "diffuse," diverging significantly from her previous assessments of that same book.

64. Neither Rokem nor any other member of the Department speaks or reads Yiddish, and Torres's scholarship primarily examines Yiddish literature. Because Rokem excluded external recommenders and scholars of Yiddish in the History and Slavic departments from Torres's review, no scholar in Torres's field conducted a substantive review of their work for the tenure review. This case has drawn outrage from the field, with many scholars writing letters of support for Torres's scholarship to the University.

65. Payne and Rokem stated that the entire department had held a discussion about Torres's materials submitted for preliminary review and then voted not to advance the case. Only Rokem was likely aware of other materials excluded (by her) from the Google Drive.

66. Contrary to the requirements of the Guidelines, the tenure committee did not produce any report, nor was the faculty discussion or vote fully documented. See Ex. G at p. 16.

***f. The University stonewalls and excludes Torres following the irregular tenure denial.***

67. In a May 9, 2025 letter from their attorney, Torres informed the University's Office of Legal Counsel of these procedural irregularities and requested that a new, independent departmental committee be assembled to conduct a tenure review, with members drawn from Torres's fields of inquiry outside the Department. The prestigious department of Slavic Languages and Literatures held a meeting to discuss the case, and faculty voted unanimously to review Torres's full tenure dossier.

68. On May 21, 2025, Torres's attorney sent the University' Office of Legal Counsel a letter confirming that one of the expected article acceptances and the book contract offer had in fact materialized, and sent excerpts of glowing reviews from this top journal and from Rutgers University Press, including a peer review of the second monograph proposal and chapters that predicted "a marvelously erudite and engaging book that will become a keystone in its field (or, perhaps, in multiple fields)."

69. Although the tenure decision was never conveyed to Torres in writing, they learned on May 27, through a personnel file request, that Rokem had sent the Dean of the Arts & Humanities Division, Deborah Nelson, a letter on April 8, 2025 disparaging Torres's scholarship record and informing her that the Department had decided not to proceed with the tenure review.

70. On information and belief, Dean Nelson refrained from conducting any substantive review of her own. She did not review Torres's tenure materials and did not produce a report of her assessment of the case.

71. On April 10, 2025, Dean Nelson sent Rokem's letter to Jason Merchant, Vice Provost for Academic Affairs. On information and belief, no one at the Provost's office conducted a substantive review of Torres's tenure case. Vice Provost Merchant responded within just over three hours to Dean Nelson, accepting the Department's decision to preclude a tenure review as an "unfortunate outcome" but commending the "seriousness of purpose that Comp Lit brought to the decision."

72. The letter misrepresents Torres's scholarly accomplishments and understates their publication record. For example, it neglects to mention an edited volume Torres had published since her renewal review, *With Freedom in Our Ears: Histories of Jewish Anarchism*. It also downplays the status of her second book, which Rokem knew was nearly under contract but misleadingly described as having been "pitched to Rutgers UP." Rokem also claims that reviews of Torres's first book have been "scant," although they far exceed the number of reviews of Rokem's own book and that of other tenure-line members of the Department.

73. The letter claims, "Rather than focusing on peer reviewed publications and preparing materials from her new book project . . . Torres has been busy with collaborative art projects, event organizing, collaborative editing, and public speaking engagements."

74. On information and belief, the reference to "public speaking engagements" refers to Torres's December 5, 2024 campus speech in solidarity with scholars from Gaza. Torres's speech recalled the University's work to bring scholars from Afghanistan to the University of Chicago and advocated for similar "support scholars from Gaza." They recited a poem by Gazan poet Mosab Abu Toha which described devastating personal loss and Palestinian dispossession. Torres's speech

concluded, "I look forward to welcoming scholars from Gaza to Chicago, and even more so, I look forward to the day when they will return home safely."

75. In a related comment, in early 2025, when Torres asked Rokem whether they should include all their cultural festival talks on their CV, she responded, "I wouldn't include your speech at the Gaza rally." The Gaza rally was not a cultural festival.

76. On information and belief, Rokem's comment about "collaborative art projects" was a reference to art Torres presented at the Venice Biennale, later acquired by the POLIN Museum in Warsaw, work for which Torres completed prior to Rokem's glowing renewal review in 2022.

77. Rokem diminished Torres's extensive scholarly research on Jewish anarcho-syndicalist contributions to the labor movement as "just a list of names" in late March 2025 during a conversation in her office. Rokem also concurred when another colleague described anarchist history as "illegible" and removed it from a website description of the department's specialties. These remarks signal that Rokem believes aspects of Jewish history – such as anarcho-syndicalist, anti-statist, anti-Zionist, non-institutional, working class, and other radical political movements and diasporic literary traditions – are simply not worthy of study by Jewish scholars.

78. On June 2, 2025, Torres sent the General Counsel's office a letter refuting and contextualizing many of the claims in Rokem's April 8 letter and showing that between the 2022 reappointment review and the present, Rokem had contradicted herself completely in her assessment of the quality of Torres's scholarship, including through 180-degree reversals regarding specific qualitative assessments of their first book.

79. On June 9, 2025, one of the University's Assistant General Counsels informed Torres's attorney that she had conducted a review and consulted with the Department, the Arts & Humanities Division and the Provost's Office, and that the University was standing behind the

Department's decision. She also claimed the decision was made "in compliance with University, Divisional and Departmental policy."

80. Torres's attorney requested an explanation as to the basis of the University's contention that the decision was in compliance with University policy. The University declined to engage with Torres's specific contentions about policy violations, instead making conclusory assertions that the determination was the "prerogative of the department" and repeating the assertion that its actions were consistent with University policy.

81. Torres attempted several times to meet with Dean Nelson and discuss the department's discriminatory behavior. Dean Nelson declined to engage with Torres about the tenure preclusion, writing dismissively in an email, "[G]iven your decision to retain a lawyer to challenge the outcome of your tenure case, I don't think a meeting would be a constructive undertaking." Other faculty, students, and alumni advocated for Torres to be given a full tenure review, but Dean Nelson declined to explain the University's decision.

82. Leading up to and following the decision, the tenured Comparative Literature colleagues Torres has encountered on campus have ostracized and excluded them. Several of them pretended they did not know who Torres is when they saw them on campus. On one occasion Payne hid behind a tree when he saw Torres approaching.

83. Near the end of the 2025-26 academic year, Rokem and Dean Nelson banned Torres from attending department meetings. Torres stated that this prevented them from carrying out their work and accurately advising students, as they were denied access to departmental matters during their ongoing employment. Rokem continued to refuse disclosing the time and location of meetings. Rokem also moved a faculty meeting off campus to her own private residence on an evening during a holiday and would not disclose the time, details, or minutes of the meeting to Torres.

84. The University's decision to preclude Torres from proceeding with the tenure review meant that their appointment ended on June 30, 2026.

85. The decision was devastating for Torres. Not only had they been working towards promotion and tenure their entire career, but they made major life and family decisions in reliance on being given a real chance at a tenure review.

**LEGAL CLAIMS**
**Count I**
**Breach of Contract**
**(Against the University)**

86. Each paragraph of this complaint is incorporated as if fully restated herein.

87. The appointment letter; renewal letter; Shils report; the Articles of Incorporation; the Guidelines on academic appointments, promotions, and hiring; and the academic freedom policies identified herein comprise part of Plaintiff's employment contract with the University. Exs. A-G.

88. Plaintiff had access to the policies reflected in Exhibits C-G throughout their employment as an Assistant Professor, and there were no relevant substantive changes during that time period.

89. Plaintiff performed their contractual duties as an Assistant Professor at the University from July 1, 2018 through June 30, 2026.

90. Plaintiff's employment contract specified that they would be permitted to apply for promotion and tenure on July 1, 2025 and that the University would review whether their dossier merited promotion and tenure during the 2025-26 academic year.

91. The University failed to provide Plaintiff the mentorship it promised them in the Renewal Letter.

92. The University also refused to provide Plaintiff sufficient time for research, loading them with service obligations far greater than those typically assigned to Assistant Professors, which detrimentally affected their publication timeline.

93. The University prevented Plaintiff from submitting their complete application for promotion and tenure for review, in breach of its contractual promises, and did not make its tenured decision based on their complete dossier.

94. The University violated its promised procedural protections when it allowed Rokem to serve as both chair of the Department and chair of the Department's tenure committee.

95. The University refused to conduct a tenure review during Torres's "last year of service," in violation of the University's Articles of Incorporation.

96. The University faulted Plaintiff for the subject matters they chose to study, their political speech on and off campus, and their interdisciplinary work, in violation of its policies guaranteeing academic freedom and freedom of expression.

97. As a result of these breaches, Plaintiff has been denied a tenure review, promotion to Associate Professor with tenure, and wages and benefits.

**Count II**
**Discrimination Based on Religion**
**Title VII, 42 U.S.C. § 2000e-2(a)(1)**
**(Against the University)**

98. Each paragraph of this complaint is incorporated as if fully restated herein.

99. Torres is Jewish in religious belief, ethical aspiration and intellectual commitment, and ethnic heritage. Torres was raised in the Amalgamated Housing Cooperative of the Bronx, NYC, a community founded by Jewish labor organizers, and this background significantly informs Torres's cultural heritage. Torres incorporates the rigorous study of working class, anti-Zionist, antifascist,

and anarcho-syndicalist Jewish history and literature into their scholarship and teaching. Thus, Torres's Jewish identity includes cultural, ethnic, religious, and political dimensions.

100. The University precluded Torres from applying for promotion and tenure and refused to review them for promotion and tenure during their final year because of their counter-stereotypical , counter-hegemonic scholarship and speech as a Jewish scholar.

101. The University's stated reasons for denying Torres the opportunity to apply for tenure were pretext for discrimination.

102. The University, the Arts & Humanities Division and the Department departed from standard tenure policies and practices in order to avoid awarding Torres promotion and tenure.

103. As a result of the University's unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, health impact, humiliation, damage to professional reputation, attorneys' fees, medical care expenses, moving expenses, and other compensatory damages.

**Count III**
**Discrimination Based on Religion**
**Illinois Human Rights Act, 775 ILCS 5 §§ 1-102, 2-102**
**(Against the University)**

104. Each paragraph of this complaint is incorporated as if fully restated herein.

105. Torres is Jewish in religious belief, ethical aspiration and intellectual commitment, and ethnic heritage. They incorporate the rigorous study of anti-Zionist and anarchist Jewish history and literature into their scholarship and teaching.

106. The University precluded Torres from applying for promotion and tenure and refused to review them for promotion and tenure during their final year because of their counter-stereotypical scholarship and speech as a Jewish scholar.

107. The University's stated reasons for denying Torres the opportunity to apply for

tenure were pretext for discrimination.

108. The University, the Arts & Humanities Division and the Department departed from standard tenure policies and practices in order to avoid awarding Torres promotion and tenure.

109. As a result of the University's unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, health impact, humiliation, damage to professional reputation, attorneys' fees, medical care expenses, moving expenses, and other compensatory damages.

**Count IV**
**Discrimination Based on Race, National Origin, and Sex**
**Title VII, 42 U.S.C. § 2000e-2(a)(1)**
**(Against the University)**

110. Each paragraph of this complaint is incorporated as if fully restated herein.

111. Torres is female and is a Latina of Puerto Rican, Costa Rican and Turkish national origin.

112. In denying them tenure, the University held Torres to higher quantitative and qualitative scholarship standards than their white and male peers who did not share Torres's national origins, assigned Torres an inappropriately heavy service load while refusing to grant course releases, and precluded them from a tenure review in the 2025-26 year.

113. The University's stated reasons for denying Torres the opportunity to apply for tenure were pretext for discrimination.

114. The University, the Arts & Humanities Division and the Department departed from standard tenure policies and practices in order to avoid awarding Torres promotion and tenure.

115. As a result of the University's unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, health impact, humiliation, damage to professional

reputation, attorneys' fees, medical care expenses, moving expenses, and other compensatory damages.

**Count V**
**Discrimination Based on Race, National Origin, and Sex**
**Illinois Human Rights Act, 775 ILCS 5 §§ 1-102, 2-102**
**(Against the University)**

116. Each paragraph of this complaint is incorporated as if fully restated herein.

117. Torres is female and is a Latina of Puerto Rican, Costa Rican and Turkish national origin.

118. In denying them tenure, the University held Torres to higher quantitative and qualitative scholarship standards than their white and/or male peers who did not share their national origins, assigned Torres an inappropriately heavy service load while refusing to grant course releases, and precluded them from a tenure review in the 2025-26 year.

119. The University's stated reasons for denying Torres the opportunity to apply for tenure were pretext for discrimination.

120. The University, the Arts & Humanities Division and the Department departed from standard tenure policies and practices in order to avoid awarding Torres promotion and tenure.

121. As a result of the University's unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, health impact, humiliation, damage to professional reputation, attorneys' fees, medical care expenses, moving expenses, and other compensatory damages.

**Count VI**
**Race Discrimination, 42 USC § 1981**
**(Against All Defendants)**

122. Each paragraph of this complaint is incorporated as if fully restated herein.

123. Torres is of Latina and Turkish ancestry and ethnicity.

124. The University held women of color generally, and Torres in particular, to higher quantitative and qualitative scholarship standards than their white peers, assigned them an inappropriately heavy service load while refusing to grant course releases.

125. Defendants precluded Torres from a tenure review in the 2025-26 year because of their ancestry and ethnic characteristics.

126. By preventing them from applying for promotion and tenure, Defendants deprived Plaintiff of equal rights in the making, modification and enjoyment of the benefits, privileges, terms and conditions of their contractual relationship with the University because of their race in violation of the Civil Rights Act of 1866.

127. But for Torres's ancestry and ethnic characteristics, Defendants would not have terminated their As a result of Defendants' unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, health impact, humiliation, damage to professional reputation, attorneys' fees, medical care expenses, moving expenses, and other compensatory damages.

WHEREFORE Plaintiff respectfully requests:

- All wages and benefits Plaintiff would have received but for the illegal actions alleged herein;
- Reinstatement to a tenure-line position at the University, or in the alternative, front pay;
- An order requiring the University to conduct a tenure review starting with a departmental-level committee in Torres's field comprised of individuals who did not participate in the unilateral decision to preclude them from a tenure review, followed by the grant of tenure if the review is successful, effective in the 2026-27 academic year;
- Compensation for emotional distress and physical sickness;
- Punitive damages;
- Other compensatory damages;
- Attorneys' fees and litigation costs; and
- Such other relief as law and justice allow.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to any issues so triable.

Dated: July 7, 2026

Respectfully submitted,

*Anna Elena Torres*

By:

/s/ Rima Kapitan

KAPITAN GOMAA LAW, P.C.
Rima N. Kapitan (6286541)
rima@kapitangomaa.com
Yusra S. Gomaa (6299883)
yusra@kapitangomaa.com
Danya B. Rashed (6346374)
danya@kapitangomaa.com
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590